FILED

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

2021 AUG 30 P 2: 08

**CHARLES R. CLEMENS**

**Plaintiff Pro Se**

CIVIL ACTION NO. 1:21-CV-1002

**(Jury Trial Demanded)**

**v.**

**COUNSELORCHEN, P.C.** a Virginia Corporation
**CONSUMER SOLUTION CENTER,** an unregistered CA company.
**JOHN ESTRADA,** an individual operating an unregistered CA Company in VA.
**BRIAN W. BRITTAIN,** an individual operating an unregistered CA Company in VA.
**GLOBAL CLIENT SOLUTIONS,** an Oklahoma LLC
**CANDICE O'BRIEN,** an individual
**JOHN/JANE DOES 1-5** are unknown entities

**Defendants**

_____/

## PLAINTIFF'S ORIGINAL COMPLAINT

### PARTIES

1.  Plaintiff, Charles R. Clemens, is a natural person, and resides at 22527 Welborne Manor SQ, Ashburn, VA 20148.

2.  COUNSELORCHEN, P.C. (Chen) is a Virginia law firm whose incorporator is Andrew Chen whose principal place of business is 6802 Paragon Place, 410, Richmond, VA., 23230. COUNSELORCHEN, P.C. by either making or causing others to make telephone

1

solicitation calls, is a Telephone Solicitor as defined by the Virginia Telephone Privacy

Protection Act (VTPPA), Va. Code § 59.1-510. They may be served by their registered

agent, C RICHARD DAVIS, 3957 WESTERRE PKWY, SUITE 401, RICHMOND,

HENRICO COUNTY, VA 23233

3. Upon information and belief, CONSUMER SOLUTION CENTER (CSC) is an unregistered

company that uses or used a Mailboxes USA mail receipt facility located at 1340 Reynolds

Avenue, 116, Irvine, (Orange County) CA 92614.

4. Upon information and belief, JOHN ESTRADA (Estrada) is an individual associated with

the so-called CONSUMER SOLUTION CENTER. JOHN ESTRADA by either making or

causing others to make telephone solicitation calls, is a Telephone Solicitor as defined by the

Virginia Telephone Privacy Protection Act (VTPPA), Va. Code § 59.1-510. Because Mr.

Estrada identity remains unclear to Plaintiff, Plaintiff intends to serve Mr. Estrada through

the Commonwealth of Virginia Secretary of State.

5. Upon information and belief, BRIAN W. BRITTAIN (Brittain) is an individual associated

with the so-called CONSUMER SOLUTION CENTER. BRIAN W. BRITTAIN by either

making or causing others to make telephone solicitation calls, is a Telephone Solicitor as

defined by the Virginia Telephone Privacy Protection Act (VTPPA), Va. Code § 59.1-510.

Mr. Brittain's identity remains unclear to Plaintiff. Plaintiff intends to serve Mr. Brittain

through the Commonwealth of Virginia Secretary of State.

6. CANDICE O'BRIEN is an individual who holds herself out to be a field agent for

COUNSELORCHEN P.C. CANDICE O'BRIEN by either making or causing others to make

telephone solicitation calls, is a Telephone Solicitor as defined by the Virginia Telephone

Privacy Protection Act (VTPPA), Va. Code § 59.1-510. MS O'OBRIEN is believed to be a

2

resident of The Commonwealth of Virginia and may be served at her residence, 13042
Hunterbrook Dr., Woodbridge, VA 22192

7.  GLOBAL CLIENT SOLUTIONS, LLC ("GCS") is an OKLAHOMA domestic Limited
    Liability Company which is located at, and may be served at through their registered agent,
    Global Client Solutions, LLC at 4343 S. 118th E AVE, Suite 220 Legal Department, Tulsa,
    OK 74134.

8.  The true names and capacities of the Defendants sued herein as John/Jane Does 1-5,
    inclusive, are currently unknown to Plaintiff and therefore sues such Defendants by fictitious
    names.  Each of the Defendants designated herein as a John/Jane Does is legally responsible
    for the unlawful acts alleged herein.  Plaintiff will seek leave of court to amend this
    complaint to reflect the true names and capacities of the John/Jane Doe Defendants when
    such identities become known.

## JURISDICTION AND VENUE

9.  **Jurisdiction.**  This court has federal question subject matter jurisdiction over Plaintiff's
    TCPA claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute.  *Mims v.
    Arrow Fin. Servs., LLC, 565 U.S. 368, 372 (2012).*  This Court has supplemental jurisdiction
    over Plaintiff's claim under the Virginia Telephone Privacy Protection Act, Va. Code § 59.1-
    514 (VTPPA) claim pursuant to 28 U.S.C. § 1367(a), because the VTPPA claim arises out of
    the same facts and circumstances as Plaintiff's TCPA claim.

10. **Venue.**  Venue is proper in this District pursuant to 28 U.S.C. § 1391 (b)(1)-(2) because a
    substantial part of the illegal telemarketing calls giving rise to the Plaintiff's claims and this

3

lawsuit were sent into and occurred in Loudoun County in this District. The Plaintiff resides in this District. The named Defendant CounselorChen, P.C. principal Andrew Chen is a bar admitted attorney and conducts business in this district. Defendants John Estrada and Brian W. Brittain hold themselves out to have worked with over 10,000 creditors nationwide and to have assisted tens of thousands of American families. (Source: Email to plaintiff dated August 30, 2019) Candice O'Brien lives and purportedly did work for CounselorChen P.C. in this district. Global Client Solutions, LLC is in the business of creating and managing consumer depository accounts. GCS does business throughout the United States, including The Commonwealth of Virginia.

11. This case arises from Defendants' violation of federal and state law by ignoring the National Do Not Call Registry. Furthermore, the Defendants made some of the calls using an automatic telephone dialing system (ATDS) that was engineered to display spoof telephone numbers. The Defendant's callers failed to fully identify him/herself and failed to provide a working telephone number whereby the Plaintiff could utilize in an attempt to have his number removed from the caller(s) marketing list, who still remain unidentified.

12. The calls caused the Plaintiff to experience frustration, emotional distress, anxiety, invasion of privacy, and lost time.

13. The calls have taken up Plaintiff's voicemail capacity and required the Plaintiff to purchase higher priced cellular plans that he would not have normally done if it had not been for the numerous unwanted calls.

14. Both Congress and the Virginia Legislature have taken serious steps toward curbing the unwanted phone calls that plague consumers.

4

15. Such marketing calls are illegal under either statutory scheme. Virginia prohibits such calls using any method without the called party's consent. Neither statute permits calling a person whose number is listed on the National Do Not Call Registry.

## INTRODUCTION

16. The National Do Not Call Registry is one of the most popular government programs ever created. The registry was established in 2003 to provide a safe haven from unwanted telemarketing calls.

17. The registry has more than 235 million active registrations, including that of the Plaintiff, Charles R. Clemens, who registered his residential number on the registry in 2008.

18. https://www.ftc.gov/reports/consumer-sentinel-network-data-book-2020

(Last visited August 21, 2021)

## APPLICABLE LAW: TCPA AND DNC PROTECTIONS AND REMEDIES

19. Congress enacted the TCPA more than twenty years ago to regulate the explosive growth of telemarketing which it recognized as a nuisance and an intrusive invasion of privacy. *See Mims v. Arrow Fin. Servs., LLC,* 132 S. Ct. 740, 745 (2012).

20. Among other things, the TCPA and its accompanying regulations prohibit sellers from making telephone solicitations to people who have their telephone number listed on the National Do Not Call Registry.

5

21. A telemarketer is prohibited from calling a Do Not Call registrant unless that registrant consents to receive the calls in a signed written agreement. 47 C.F.R.§ 64.1200(c)(2)(ii).

22. To avoid calling a number listed on the registry, a telemarketer can easily and inexpensively "scrub" its call lists against the registry database at least once every thirty-one (31) days. *See* 16 C.F.R. § 310.4(b)(3)(iv).

23. It is well established that a seller of goods or services can be liable for TCPA violations even if the seller does not directly place or initiate the calls.

24. "A person who has received more than one telephone call within any 12-month period *by or on behalf of* the same entity in violation of the regulations prescribed under this subsection" may bring an action for damages and injunctive relief. 47 U.S.C.§ 227(c)(5) (emphasis added).

25. As part of the continuing effort to prevent the type of violation(s) at issue in this case—where businesses hire others to hide their role in telemarketing campaigns—the FCC has ruled that companies may be held vicariously liable for calls made on their behalf in a wide variety of situations including when the companies knowingly benefit from the calls.

26. See in the matter of *Joint Petition Filed by Dish Network, LLC, the United States of America, and the States of California, Illinois, North Carolina, and Ohio for Declaratory Ruling Concerning the Tel. Consumer Prot. Act (TCPA) Rules*, 28 F.C.C.R. 6574, 6588 (2013) ("FCC Vicarious Liability Order"). As the FCC explained:

> [T]he seller is in the best position to monitor and police TCPA compliance by third-party telemarketers. We thus agree that, consistent with the statute's consumer protection goals, potential seller liability will give the seller appropriate incentives to ensure that their telemarketers comply with our rules. By contrast, allowing the

6

> *seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case.*

*Id; see also id.* at 6593 ("we see no reason that a seller should not be liable under those provisions for calls made by a third-party telemarketer when it has authorized that telemarketer to market its goods or services.  In that circumstance, the seller has the ability, through its authorization, to oversee the conduct of its telemarketers, even if that power to supervise is unexercised")

## FACTUAL ALLEGATIONS

27. Plaintiff is the customary user of wireless telephone number (518) 495-9301.  The wireless account is in the name of Plaintiff wife, Jacqueline Beal, who is and has been a resident of the commonwealth of Virginia since 2011.

28. The wireless account and related equipment, iPhone (s), is marital property and paid for each month from marital community funds.  The telephone line is used by Mr. Clemens for personal reasons including making and receiving all residential telephone calls since first becoming a resident of the Commonwealth of Virginia in 2011.

29. Telephone line (518) 495-9301 has been on the National Do Not Call Registry since 2008.

30. Beginning August 30, 2019 at or around 3:02 PM, an individual named Jason called Claimant on wireless telephone line (518) 495-9301.  The caller ID displayed the number (878) 201-9429 originating from Rochester, PA.

31. Claimant answered "Hello... Hello" and there was a noticeable pause on the line indicating the call was made by an ATDS as were many of the calls described in this complaint.

32. Upon information and belief, the caller asked for Jacqueline Beal, the Claimant's wife. Claimant answered the call and responded as though he were "Mr. Beal" when the caller addressed him by this name.  Claimant also responded to subsequent callers in this same manner.

33. The caller stated he was with "Credit Solutions" and appeared to be working from a script about how one could eliminate credit card debt and interest.

34. A brief conversation ensued with Jason. The Claimant feigned interest in the service but did so only to fully identify and obtain documentary evidence to use against the underlying participators.

35. Next, in the same call, a second individual described by Jason as a "Senior Debt Specialist" came on the line and introduced himself as John Estrada and stated his company was Consumersolutioncenter.com.

36. Mr. Estrada stated I know you were just transferred to me by Jason, a "Senior Debt Specialist." Jason informed me that the reason you were transferred is because you meet some of the basic criteria for interest rate payment reduction.

37. Mr. Estrada explained how potential participants are evaluated for entrance into the debt reduction program.  Below is a brief synopsis:

a) Potential participants with large debt to credit limits and high interest rates are analyzed to ascertain if a true hardship exists. Once it is determined that a hardship exists, potential participants are approved for entry into the program.

b) Participants are instructed to stop paying on unsecured debt that is entered into the program. It is explained that ultimately the debt will be charged-off and that an average settlement of 39% of the total amount of debt entered into the program would be achieved for the participant.

c) Instead of paying the monthly credit card bill(s) to the creditor, program participants have an approximate monthly amount, 39% of the total amount entered the program and divided proportionally over a twenty-four to forty-eight (24 - 48) month period, drafted from their personal bank account and into a FDIC insured dedicated savings/holding account in the participant's name.

d) The FDIC insured dedicated savings/holding account in the participant's name is set up, purportedly, through CounselorChen's law firm in association with Global Client Solutions, a company located in Oklahoma.

e) Once account reserves build up in the savings/holding account to an amount able to settle one of the accounts entered into the program, it is settled after first being approved by the participant at an average settlement of 39%. This amount is then drafted from the account and sent, in part, to the creditor in exchange for a pre-negotiated release.

f) This process is repeated until all the accounts entered in the program are settled.

38. Mr. Estrada continued the conversation about the program by stating that there is a fee involved, but that amount is included in the reduced amount that the participant will pay into the savings/holding account described above.

9

39. During the call, Mr. Estrada makes references to "our attorneys" and stated that "all the paperwork is through attorneys" and that "attorney is Counselor Chen in Richmond." He repeats, "the attorney is Andrew Chen." He further states "the attorney website is andrewchenlaw.com."

40. Mr. Estrada added that they, meaning Chen's law firm, "will assign a case worker who will work with you throughout the case."

41. Mr. Estrada stated that a face-to-face meeting with the attorney group would be required before the program effectuated.

42. Mr. Estrada stated that an email containing the attorney's information would be sent the program participant.

43. Claimant received an email on August 30, 2019 from Mr. Estrada, johne@consumersolutioncenter.com . The email is attached as Exhibit 2.

44. A second call was received from Mr. Estrada at or around 11:59 AM on September 3, 2019. The caller ID displayed from (949) 555-1212 from *United States*. During the call, Mr. Estrada was asked at least two times if Ms. Beal could retain credit cards that had high credit limits and no balance. Mr. Estrada stated and again restated that only those credit cards entered into the program would be affected. He continued by saying that she could keep the cards as long she continues to pay on them.

45. Mr. Estrada made at least 27 telephone calls to Plaintiff using caller id (949) 555-1212 and (949) 440-1304. See Excel sheet of calls, Exhibit 1.

46. Mr. Estrada misleadingly stated that the first account settlement would begin approximately six to eight (6 - 8) months into the program.

47. Mr. Estrada reiterated that "we have an attorney group, and their job is to negotiate down the balance of the debt." Mr. Estrada repeatedly stated that a representative from the attorney group will be present when Ms. Beal attends the face-to-face meeting.

48. When Claimant asked why the caller ID displayed Pennsylvania, Mr. Estrada stated that technology enabled his calls to be routed through this state to "keep expenses down."

49. On September 4, 2019, the Claimant received five (5) calls from Mr. Estrada. On the first call, Mr. Estrada stated "we actually submit an application to the underwriting department and by the way it's all going through a law firm so all the information you provide to us is private and confidential."

50. Claimant informed Mr. Estrada, when he was asked for Ms. Beal's social security number, that he prefers to give this sensitive information to the lawyer directly. Mr. Estrada sought clarification by asking "to the lawyer directly?" to which the Claimant replied "yeah." In response, Mr. Estrada stated "Ok, ok, that's fine, that's fine. We can definitely do that" indicating that this information could be provided at the face-to-face meeting with the law firm.

51. Mr. Estrada was asked at or around 12:45 PM in a call on September 4, 2019 when we would know if the application was approved. Mr. Estrada stated today!

52. In less than an hour, Mr. Estrada advised Claimant they did "preapprove" the application and the next step would be to get the application over to the quality control department.

53. During the third call on September 4, 2019, the quality control department came on the line. A quality control representative said, "Hello Charles?" to which the Claimant replied "yes." She continued "Thank you so much for holding. My name is Paula on a recorded line for quality assurance and training purposes. I'll be assisting you with your quality control call

today. Let me start off by letting you know that Counselor Chen has helped many

individuals with their debt problems and would like to thank you for allowing us help you

with yours."

54. The quality control representative continued "Now the reason for this call is really to just

make sure you understand ... points of our program before we send our representative to meet

you in person." Note that part of her statement was inaudible, and that part is represented

with three dots. This call concluded prematurely when Claimant advised Paula,

CounselorChen, P.C.'s representative, that the Claimant's name was mistakenly included on

the agreement. The agreement should only include the Claimant's wife's name, Jacqueline

Beal.

55. On the fourth call on September 4, 2019 at or around 2:13 PM, Mr. Estrada stated "sorry

about what happened, I overheard the call but couldn't say anything." Here he is referring to

the mistake about the Claimant's name appearing on the agreement. He continued to say that

calls are recorded, he is not allowed to be on the call, but he knows exactly what happened.

He stated that the underwriting department is very rigid and follows protocols for calls.

56. On the fifth call on September 4, 2019, at or around 6:01 PM, Lucy E. of the quality control

department came on the line and repeated almost verbatim the script as described previously

from the first call from the quality control department. Towards the end of the call, Lucy

stated that any questions that you have may be addressed to Counselor Chen at (866) 309-

7368.

57. The call with Lucy. concluded after a face-to-face appointment was scheduled for September

9, 2019 at 7:00 PM at a Starbucks, 22420 Flagstaff Plaza, Unit 100, Ashburn, VA 20148

which is located near Ms. Beal's home.

58. On September 5, 2019 at or around 3:13 PM, the Claimant received a call from a CounselorChen representative, Candice O'Brien, on telephone line (571) 298-7565. Ms. O'Brien confirmed the face-to-face meeting at Starbucks was scheduled for September 9, 2019 at 7:00 PM.

59. Mr. Estrada continued calling Claimant and overseeing the sale of the debt reduction program.

60. On September 9, 2019 at or around 6:02 PM, Claimant received a second call from Ms. O'Brien, a CounselorChen representative on telephone line (571) 298-7565, and again confirmed the face-to-face meeting at Starbucks scheduled for that evening at 7:00 PM.

61. Claimant and his wife, Jacqueline Beal, met Ms. O'Brien at Starbucks as scheduled.

62. Ms. O'Brien provided introductory debt reduction program paperwork listing the names of those attending the meeting. The paperwork listed the name "Charles Clemens" and not "Charles Beal" which is how he identified himself as and answered to during all the calls. The Claimant never provided his actual last name.

63. Ms. O'Brien asked the Claimant to read a voluminous package of information about the debt reduction program. The Claimant and his wife, Jacqueline Beal, informed Ms. O'Brien that they needed more time to read the paperwork. Claimant and his wife left the meeting with the paperwork after Ms. O'Brien agreed to allow them to do so.

64. Sometime following the meeting, Claimant became aware that Counselor Chen had more than one website. Claimant became alarmed after learning through a Google search on Chen that a Better Business Bureau Profile stated: *Out of Business. Mail sent to the business on 7/05/2018 was returned by the U.S. Postal Service as Undeliverable as Addressed.*

65. The following day on September 10, 2019, Mr. Estrada texted the Claimant and stated that that he was "looking at the notes from the law firm" and it seems like you guys needed a little more time to look over the paperwork. He said to contact him with any questions.

66. Mr. Estrada continued calling the Claimant in pursuit of getting the Claimant's wife to execute the documents to enter the debt reduction program.

67. Because Claimant and his wife had provided Mr. Chen with what they thought to be numerous confidential attorney client privilege application and schedules, they were shocked to learn, after reviewing information contained in the large package provided by Ms. O'Brien, that it contained an affidavit entitled CounselorChen, P.C. FIELD AGENT DECLARATION, signed by Ms. O'Brien, that attested that "The materials provided at the face-to-face meeting are the same as those on file with Global Client Solutions."

68. Claimant searched for Consumer Solution Center using the address provided by Mr. Estrada and learned that there is not a corporate entity registered with this name in the California Secretary of State's database. Additionally, there is not a fictitious business listing for Consumer Solution Center with Orange County, CA, Clerk Recorder office.

69. Claimant learned Mr. Chen and Mr. Estrada were both using Regus type rentable office space.

70. Because Claimant had provided bank account numbers, routing information, date of birth, in addition to many other schedules of personal information to what he thought was a law firm, Claimant became uneasy when he and his wife learned about the untrustworthy findings mentioned above.

71. Claimant paid someone with access to subscription only databases believed to be called
    LexisNexis SmartLinx.  That person confirmed there was no corporate listing for Consumer
    Solution Center in Irvine, CA in Orange County.

72. Upon information and belief Consumer Solution Center website,
    www.consumersolutioncenter.com was created on July 19, 2019. This date very much
    contradicts Consumer Solution Center email to Claimant which stated:

    a) Our financial advisers have helped thousands of American families create an active plan
       to pay off their balances and start saving for the more important things in life.

    b) We have worked with more than 10,000 creditors nationwide.

    c) Thousands of satisfied customers nationwide.

    d) We have assisted tens of thousands of American families with their finances.

73. On September 12, 2019, Claimant asked Mr. Estrada why there was no listing for Consumer
    Solution Center and he gave no direct reply.  Mr. Estrada evaded the question.

74. At the opportune moment in the conversation, Claimant reiterated the question about the
    absence of corporate registration or doing business as (DBA) under a fictitious name and the
    line went dead.

75. Mr. Estrada called back, and Claimant believes that he feigned that there was a bad
    connection and hung up again.

76. About ten (10) minutes later on that same day, an individual who identified himself as Brian
    Brittain telephoned the Claimant from telephone line (714) 390-3016.  He stated that he was
    one of the managers and apologized for the disconnects, described above, which had
    occurred with Mr. Estrada.

77. Claimant directed the question about the absence of the corporate entity information to Mr. Brittain. He also evaded the question and spinned a response. Mr. Brittain asked the Claimant if he was sitting by a computer and that he would send Claimant links. Claimant responded that he was not by a computer.

78. Claimant then asked Mr. Brittain if he abided by the National Do Not Call Registry. Again, Mr. Brittain attempted to divert the question until Claimant specifically asked him to send him a copy of Consumer Solution Center's internal do not call policy. Claimant told Mr. Brittain to not call him again. In response, Mr. Brittain stated that he would not send a copy of the policy. Claimant repeated his request for a copy of their do not call policy and again asked Mr. Brittain not to call again. The call ended.

79. After having informed Consumer Solution Center to not call Claimant again, they continued to call on September 23, 2019, and again on September 25, 2019. Claimant has screen shots of call attempts/missed calls from both of Mr. Estrada's telephone numbers.

80. Claimant ascertained in late September 2019 that Consumer Solution Center's website, www.consumersolutioncenter.com, had been taken down and that the web address was for sale by GoDaddy.

81. Upon information and belief, Mr. Chen is participating in a debt reduction program that mimics the so called "attorney model" of debt settlement in order to evade Virginia licensing and fee limitation requirements in order to compensate the non-attorney affiliates that Claimant references throughout this complaint.

82. Claimant and his wife were led to believe through Mr. Estrada they could rely upon information provided through him and that a licensed attorney, Mr. Chen, and employees of his firm were the persons involved in settling Jacqueline Beal's credit card debt.

83. Claimant reiterates that Mr. Estrada told him that Chen's law firm "preapproved" his wife's application for the debt reduction program. Upon information and belief, Claimant asserts that Mr. Chen knew or should have known about the so-called preapproval(s) but neither he nor anyone in the Chen firm had anything to do with any preapproval. That it was a ruse.

84. Rather, Claimant believes that if any preapprovals were conducted at all, it was merely a rubber stamp by employees of the overall scheme who are located in another state and pretend to be employees or subcontractors to Mr. Chen while not being directly supervised by him.

85. Claimant reiterates that he was told by Mr. Estrada that "underwriters" through Chen's law firm conducted the two (2) quality control department telephone confirmations described above.

86. Upon information and belief, Claimant asserts Mr. Chen had nothing to do with conducting any so-called quality control department call(s) made in Andrew Chen's aka CounselorChen, P.C.'s name.

87. Rather, Claimant believes the quality control department call(s) were conducted by employees located in another state who pretended to be employees of Mr. Chen or the Chen Law Firm or are subcontractors to Mr. Chen but are not directly supervised by him or anyone at his firm.

88. Claimant reiterates he was told by Mr. Estrada that a face-to-face meeting with a member of Chen's law firm would be required before the program effectuated.

89. Upon information and belief, Claimant asserts Mr. Chen had nothing to do with confirming, on two occasions as previously described, that Candice O'Brien was a member of the Chen firm.

90. Rather, Claimant believes Ms. O'Brien was hired and trained, as attested to by documents she provided to the Claimant, not by Mr. Chen or by any member of his law firm but instead possibly by Global Client Solutions. That is, Ms. O'Brien pretended to be an employee of the Chen law firm when she called the Claimant to confirm the meeting at Starbucks on September 9, 2019.

91. It was not until **AFTER** the Starbucks meeting that Claimant and his wife, Jacqueline Beal, knew anything about any possible third parties being involved in the so-called debt settlement. This was particularly disturbing since attorney client privileged information had been given to employees of presently unknown companies that Mr. Chen was not supervising.

92. Upon information and belief, Claimant asserts Mr. Chen permitted unsupervised employees of presently unknown companies access to Jacqueline Beal's private attorney client privileged financial information, financial condition hardship declarations, financial budget, date of birth, etc. and to take that information, without a licensed Virginia counsel known to Claimant or his wife, (if counsel were present at all) which allowed for the voluminous packet (described) to be created outside Mr. Chen's direct supervision.

93. Claimant asserts that Mr. Chen knew or should have known that the aforedescribed confidential information was in the hands of Global Client Solutions as field agent Ms. O'Brien attested to this in an affidavit which is described previously.

94. Neither Claimant nor his wife were ever made aware before the Starbucks meeting, that there was ever a need for Global Client Solutions or any non-law firm employee to have access to Ms. Beal's confidential information,

18

95. During the call with Mr. Chen's quality control department, described above, Ms. Beal was advised that she could contact Counselor Chen at the firm's telephone number, (866) 309-7368.

96. Numerous documents including CounselorChen, P.C.'s representation agreements provide telephone number (866) 309-7368 as that being the Chen law firm telephone number.


97. Mr. Chen's website, www.andrewchenlaw.com , lists telephone number (866) 309-7368 as that of the Chen law firm.  Upon information and belief, telephone number (866) 309-7368 does not connect to Mr. Chen's office in Richmond, VA.  Instead that number is associated with a call center in another state who falsely identify themselves as employees of the law firm of CounselorChen, P.C.

98. It is believed each attorney law firm participating in the debt reduction scheme telephone line, while different so as to be able to identify each law firm, are answered similarly.

99. The fax number listed in Mr. Chen's retainer agreements, (877) 255-6316, is not really his fax number.  This fax number is believed to be associated with presently unknown promoters of the illegal scheme in which Mr. Chen participates.

100.    Claimant has screen shots and bookmark caches of Google searches of "(877) 255-6316", "8772556316", and "877-255-6316".  The searches produced three different Better Business Bureau (BBB) profiles of law firms in Orange County, CA, Parkland, FL, and Cleveland, OH.

101.    The number (877) 255-6316 appeared in the BBB profile of the three firms apparently as the result of consumer complaints filed against the firms for debt settlement issues.

19

102.    The CA law firm had four (4) complaints filed in the twelve (12) month period following the events described in this letter.

103.    The websites of each law firms' services, field agent log in, and images all have remarkably similar characteristics to those on Mr. Chen's law firm website.

104.    The privacy page and terms of use are identical.

105.    Mr. Chen's law firm, using methodologies described in this letter, encouraged Ms. Beal to participate in a debt reduction program that Mr. Chen knew or should have known was illegal because it violated Virginia criminal statutes.

106.    While Mr. Chen, as an attorney is exempt from Virginia's Credit Counseling statute, (Va. Code Ann. § 6.2-2000 through § 6.2-2025) he either knew or consciously avoided knowing that participant marketer/agent Consumer Solution Center was not licensed or bonded as a credit counselor in Virginia under the aforedescribed act and regulation.

107.    A debt management plan is defined by Virginia statute as a "program whereby a person agrees to engage in debt pooling and distribution services on behalf of a consumer."

108.    Claimant believes Mr. Chen had little to almost no involvement in the research, development, design, or recruitment of any potential participants of the debt reduction plan.

109.    While the plan may have been under the guise of Mr. Chen's law firm, it was put together by presently unknown third parties.

110.    The plan was marketed by companies including the believed to be fake company going by the name Consumer Solution Center, described.

111.    That Consumer Solution Center led Ms. Beal and her husband to believe the plan was that of the CounselorChen, P.C., a law firm.

112. Consumer Solution Center's Mr. John Estrada provided credit counseling in violation of Virginia Credit Counseling statute to Ms. Beal.

113. Mr. Estrada knowingly and falsely advised Ms. Beal's husband that she could keep and would not have to close credit card accounts that contained high credit lines provided she continue to pay on the balance of those accounts.

114. Nothing could be further from the truth. In fact, Mr. Estrada had to know the moment that Ms. Beal's enrolled accounts became thirty (30) days late, credit bureau alerts very likely would have gone out to card issuers even in spite of there not being enrolled in the debt reduction program. Hence, this would have jeopardized tens of thousands of dollars in credit lines that Ms. Beal was relying upon to use.

115. Mr. Estrada advised Ms. Beal's husband that within months of entering the debt reduction program and after the first credit card account had settled, she would begin to see an improvement in her FICO scores. Again, this advice is not true. At the earliest and as illustrated below, it would have been a minimum of twenty-two to twenty-three (22 to 23) months and quite possibly longer before Ms. Beal would see any score increases.

116. Mr. Estrada had to know that the first several months of the debt reduction program offered to Claimant is depleted by the costs of the program and are substantially depleted for the remainder of their participation in the program.

117. Undeniably, Ms. Beal was misled by Mr. Estrada and only became fully aware of the downsides of the debt reduction program after she examined the schedule of payments included in the voluminous packet Chen's purported representative wanted signed at the Starbucks meeting.

118.   The monthly payments that Ms. Beal would have been required to pay into the escrow
       account to settle her debt were going to be structured in such a way that a good majority of
       the money would <u>first</u> go to pay fees charged by Mr. Chen.  These fees are disguised as a
       legal fee, engagement fee or service fee, and/or a service fee.

119.   For example, if two of Ms. Beal's credit card accounts with the lowest balances of
       $2159.00 and $9365.00 totaling $11524.00 were entered into the debt reduction program and
       settled at 39%, it would take over twenty-one (21) monthly payments of $704.98 for a total
       of $14,804.58 to be paid before there are enough in reserves to reach thirty-nine percent
       (39%) of 11,524 which is $4494.86.  According to Schedule B, Payment Schedule, the
       amount in reserves, the YTD Savings column, after twenty-one (21) months of $704.98
       payments is only $4384.66 and therefore short of $4494.86.  Participants are not able to reach
       a reserve amount sooner because there are large fees, ranging from $459.77 – $704.98, that
       are paid each month and thus not contributed to reserves.  Additionally, and importantly,
       these numbers are highly unattainable within this timeframe because the credit card accounts
       will likely have accumulated late fees and risk-based interest rates 23.99 to 29.99 percent.

120.   If the debt reduction plan were conducted according to statute and regulation, the gross
       profit accumulated after Ms. Beal made twenty-one (21) payments of $704.98 would not be
       allowed to be distributed until after each account entered the program is settled.  Routine
       bank service fees and legitimate attorney fees that can be substantiated are the exception.

121.   Claimant believes that the presently unknown program organizers conjure up fees
       disguised to the client as legal fees, engagement fees, and service fees who then bill Mr.

Chen.  In turn, he authorizes Global Client Solutions to make the illegal payments to the

Chen law firm who in turn, skirts the regulations by paying the organizers, and marketers,

and others participating in the scheme prior to the credit card account being settled.  This

practice violates Virginia law.

122.    Mr. Chen knew the program, also known as "the attorney model" by state attorney

generals, was designed to circumvent fees that would, as is usually the case with these of

type schemes, be illegally taken off the top of participant's monthly payments.  Ms. Beal

would have been subject to this if she had participated in the program.

123.    Mr. Chen knew or consciously avoided knowing that Global Client Solutions, contrary to

federal law, has previously transmitted unlawful fees to itself and other program participants

before any settlement(s) had been made.

124.    Mr. Chen knew or consciously avoided knowing that Global Client Solutions has

received hundreds of complaints from or on behalf of consumers concerning fees paid in

connection with debt relief services.

125.    Mr. Chen knew or consciously avoided knowing that Global Client Solutions had

previously agreed to a Stipulated Final Judgment and Consent Order in settlement of claims

brought against them by the Consumer Financial Protection Bureau for violation of the

Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. 6101-6108, as

amended, and implemented by the Telemarketing Sales Rule, 16 CFR Part 310 ("TSR").

126.    Despite these complaints and consent orders, Mr. Chen recklessly allowed his law firm's

practice name(s) to be used for the purpose of creating a false pretense that legal and debt

adjustment services were being performed by an attorney.  This action encouraged

consumers, including Ms. Beal, to do business with companies such as Global Client

Solutions and Consumer Solution Center, the latter a company believed to not even exist.


127.   Mr. Chen knew or consciously avoided knowing that Consumer Solution Center was

unlawfully marketing, preparing, and providing documentation to consumers, including Ms.

Beal, all while illegally engaging in the solicitation of clients for a law firm.

128.   As a result of the aforedescribed allegations and resulting violations of Virginia Credit

Counseling statutes, described, Claimant and his wife Jacqueline Beal had to expend monies

in the researching of companies in efforts to correctly determine the true identities of

program marketers and agents because the information provided to Claimant and his wife,

Jacqueline Beal, could not be verified.

129.   These losses violate Virginia's Consumer Protection Act (VCPA) (Va. Code Ann. § 59.1-

196 through § 59.1-207 which both Chen and Consumer Solutions Center are believed to

have violated.

130.   Both Andrew Chen of CounselorChen, P.C. and John Estrada of Consumer Solutions

Center violated the VCPA because they misrepresented to Claimant and his wife, Jacqueline

Beal, their services as those of another.  Section 59.1-200(1) of the VCPA specifically states

that it is unlawful for a "supplier in connection with a consumer transaction…(to)

(m)isrepresent (its) goods or services of another."


131.   Upon information and belief, Plaintiff believes CSC telephone records will demonstrate

that he may have called Plaintiff earlier than August 30, 2019, using spoof telephone

numbers.

24

132.    Plaintiff is presently unable to identify with certainty each call that CSC/John Estrada is

responsible for making without conducting formal discovery.

133.    Plaintiff has never given CounselorChen P.C. or any of his marketers, as defined by the

TCPA, *prior express written consent* to call him.

134.    Plaintiff never provided his telephone number to any of the defendants, known or

unknown, in this complaint.

135.    Plaintiff did not have an established business relationship with any of the Defendants,

known or unknown, in this complaint.

136.    It is highly unlikely the marketers/agents or Mr. Chen's law practice have subscriptions

to SAN lists, required by federal law to identify people on the national do not call list.

137.    The calls were not made for an emergency purpose.


## COUNSELORCHEN, P.C. LIABILITY for CONSUMER SOLUTION CENTER'S, JOHN ESTRADA, BRIAN W. BRITTAIN, and CANDICE O'BRIEN'S CONDUCT.

138.    For more than twenty years, the FCC has explained that its "rules generally establish that

the party on whose behalf a solicitation is made bears ultimate responsibility for any

violations." *In re Rules & Regulations Implementing the TCPA*, CC Docket No. 92-90,

Memorandum Opinion and Order, 10 FCC Rcd 12391, 12397 (¶ 13) (1995).

139.    In its January 4, 2008 ruling, the FCC likewise held that a company on whose behalf a

telephone call is made bears the responsibility for any violations. *Id.* (specifically recognizing

"on behalf of" liability in the context of an autodialed or prerecorded message call sent to a

consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

140.    In fact, the Federal Communication Commission has instructed that seller(s) such as

CounselorChen P.C. and Global Client Solutions may not avoid liability by outsourcing

telemarketing to third parties such as Consumer Solution Center, John Estrada, Brian W.

Brittany and the Doe Defendant known as Jason:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing
> activities to unsupervised third parties would leave consumers in many cases without
> an effective remedy for telemarketing intrusions. This would particularly be so if the
> telemarketers were judgment proof, unidentifiable, or located outside the United
> States, as is often the case. Even where third-party telemarketers are identifiable,
> solvent, and amenable to judgment limiting liability to the telemarketer that
> physically places the call would make enforcement in many cases substantially more
> expensive and less efficient, since consumers (or law enforcement agencies) would be
> required to sue each marketer separately in order to obtain effective relief. As the
> FTC noted, because "[s]ellers may have thousands of 'independent' marketers, suing
> one or a few of them is unlikely to make a substantive difference for consumer
> privacy."
>
> *May 2013 FCC Ruling*, 28 FCC Rcd at 6588 (¶ 37) (internal citations omitted).

141.    May 2013 FCC Ruling further clarifies the circumstances under which a

telemarketer has apparent authority:

> [A]pparent authority may be supported by evidence that the seller allows the
> outside sales entity access to information and systems that normally would be
> within the seller's exclusive control, including access to detailed information
> regarding the nature and pricing of the seller's products and services or to the
> seller's customer information. The ability by the outside sales entity to enter
> consumer information into the seller's sales or customer systems, as well as the
> authority to use the seller's trade name, trademark and service mark may also be
> relevant. It may also be persuasive that the seller approved, wrote or reviewed the
> outside entity's telemarketing scripts. Finally, a seller would be responsible under
> the TCPA for the unauthorized conduct of a third-party telemarketer that is
> otherwise authorized to market on the seller's behalf if the seller knew (or
> reasonably should have known) that the telemarketer was violating the TCPA on
> the seller's behalf and the seller failed to take effective steps within its power to
> force the telemarketer to cease that conduct.
> 28 FCC Rcd at 6592 (¶ 46).

142.    On May 9, 2013, the FCC released a Declaratory Ruling holding that a corporation or

other entity that contracts out its telephone marketing "may be held vicariously liable under

federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers."[1]

143.    Finally, the May 2013 FCC Ruling states that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *Id.* at 6592-593 (¶ 46). Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 (¶ 46).

144.    CounselorChen P.C. is liable for CSC/Estrada's/Brittain's/O'Brien's telemarketing calls.

145.    CounselorChen P.C. maintains control over its' actions, both as to telemarketing and other types of marketing activity.

146.    CounselorChen P.C. directs the content of its marketer's advertising.

147.    Upon information and belief, CounselorChen P.C. retains absolute and unilateral control over the content of its advertising.

148.    For example, CounselorChen P.C. requires that all advertising that directly or indirectly identifies CounselorChen P.C., such as call scripts, must be approved prior to use by its marketer's.

149.    CounselorChen P.C. specifically retains the right to place whatever limitations it pleases upon what applications for debt reduction its marketers are permitted to submit to CounselorChen P.C.

---

[1] *In re Joint Petition Filed by DISH Network, LLC et al. for Declaratory Ruling Concerning the TCPA Rules*, 28 FCC Rcd 6574, 6574 (¶ 1) (2013) ("May 2013 FCC Ruling").

150.   At all times relevant, CounselorChen P.C. had absolute control over whether, and under what circumstances, they issue a debt reduction plan to a prospective customer.

151.   CounselorChen P.C. could have restricted its marketers to have used lead generators that did not use automated telemarketing dialers, but they did not.

152.   CounselorChen P.C. accepted the benefits of the marketer's illegal telemarketing by accepting debt reduction plans despite the fact that these plans were generated-through illegal telemarketing.

153.   CounselorChen P.C. knew, or reasonably should have known, that CSC/Estrada/Brittain/ and O'Brien were violating the TCPA on its behalf and failed to take effective steps within its power to force the marketers to cease that conduct.  Any reasonable seller that accepts debt reduction plans from their marketers would and indeed must investigate to ensure that the calls were made in compliance with TCPA rules and regulations.

154.   Plaintiff is presently unable to present with specificity theories of vicarious liability until after formal discovery is conducted.

155.   Plaintiff alleges CounselorChen P.C. is vicariously liable because of the acts of its marketers, CSC/Estrada/Brittain and O'Brien, and other DOE defendants under the following theories:

   a. Subagency/Formal Agency/Actual Authority;

   b. Apparent Authority; and

   c. Ratification.

**Subagency/Formal Agency/Actual Authority**

156.   With regard to torts committed by an agent, the Restatement provides:

   § 7.04 Agent Acts With Actual Authority

   A principal is subject to liability to a third party harmed by an agent's conduct when the

agent's conduct is within the scope of the agent's actual authority or ratified by the principal; and

(1) the agent's conduct is tortious, or

(2) the agent's conduct, if that of the principal, would subject the principal to tort liability.

*See* RESTATEMENT (THIRD) OF AGENCY § 7.04 cmt. d (2) (2006).

157.    The purpose of CounselorChen P.C. agents is to serve CounselorChen P.C. by soliciting applications for debt reduction plans from consumers on behalf of CounselorChen P.C.

158.    Respective debt reduction agents had the actual authority of CounselorChen P.C. to make the complained-of calls.

159.    CounselorChen P.C. agents were, and are, authorized to hire third parties CSC/Estrada/and Brittain including the DOE Defendants, to perform marketing, including telemarketing.

160.    CounselorChen P.C. provided its agents permission to perform the telemarketing that is the subject of this lawsuit.

**Apparent Authority**

161.    CounselorChen P.C. gave their agents substantial power to affect their legal relations with third parties, including the Doe Defendants and consumers.

162.    CounselorChen P.C. cloaked its agents with apparent authority to enter into advertising arrangements on its behalf, including lead generation telemarketing through the Doe Defendants.

**Ratification**

163.   Upon information and belief, CounselorChen P.C. and its agent(s) CSC/Estrada/and
       Brittain ratified the Doe Defendant's illegal marketing scheme by knowingly accepting the
       benefits of the Doe Defendant's lead generation activities.

164.   These leads provided CounselorChen P.C. and its agents with additional business
       prospects.

165.   Upon information and belief, CounselorChen P.C. and its agents including
       CSC/Estrada/and Brittain were aware of the Doe Defendants marketing scheme that included
       making calls using an "artificial or prerecorded voice" or placed by an "automatic telephone
       dialing system" when they accepted the marketing leads from the presently unidentified Doe
       Defendant(s).

166.   In participating in these calls, CounselorChen P.C. manifested an intent to accept the
       benefit of the Doe Defendants calling campaigns; including calls that were made by said Doe
       Defendants on its behalf that did not result in a debt reduction plan quote.

167.   Even if CounselorChen P.C. did not realize that specific debt reduction plan quotes were
       generated through the Doe Defendants, CounselorChen P.C. made a conscious choice to
       issue quotes for debt reduction plans without adequate knowledge of the source of the quotes.

168.   Because it accepted the calls' benefits, CounselorChen P.C. cannot avoid the burden
       associated with its ratification.

169.   Vicarious liability for TCPA violations can arise out of ratification. As the FCC
       stated:

> Restatement (Third) of Agency § 2.03, cmt. c. As commonly understood under
> modern agency principles reflected in the Third Restatement, such apparent
> authority can arise in multiple ways, and does *not* require that "a principal's

manifestation must be directed to a specific third party in a communication made directly to that person. *Id.*, reporter's note a. Rather, "a principal may create apparent authority by appointing a person to a particular position." *Id.* Similarly, "a principal may permit an agent to acquire a reputation of authority in an area or endeavor by acquiescing in conduct by the agent under circumstances likely to lead to a reputation." *Id.*, cmt. c. And "[r]estrictions on an agent's authority that are known only to the principal and the agent do not defeat or supersede the consequences of apparent authority for the principal's legal relations" with others." *Id.* In such circumstances, for example, the presence of contractual terms purporting to forbid a third-party marketing entity from engaging in unlawful telemarketing activities would not, by themselves, absolve the seller of vicarious liability.

*May 2013 FCC Ruling*, 28 FCC Rcd at 6586, n 102.

## CAUSES OF ACTION

### COUNT I

(Negligent Violation of the TCPA "RoboCall" Prohibition, 47 U.S.C. § 227 et seq.)

170.   Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs above.

171.   As a result of Defendants' and Defendants' agents negligent violations of 47 U.S.C.§ 227(b)(1 )(A), Plaintiff seeks for himself $500.00 in statutory damages, for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B).

172.   Pursuant to 47 U.S.C. § 227(b)(3)(A), Plaintiff seeks injunctive relief prohibiting such conduct in the future.

### COUNT II

(Knowing and/or Willful Violation of the TCPA "RoboCall" Prohibition, 47 U.S.C. § 227 et seq.)

173.   Plaintiff incorporates and realleges, as though fully set forth herein, each of the

paragraphs above.

174.    As a result of Defendants' and Defendants' agents knowing and/or willful violations of 47

      U.S.C. § 227(b)(l)(A), Plaintiff seeks for himself treble damages, as provided by statute, up

      to $1,500.00 for each and every violation, pursuant to 47 U.S.C. § 227(b)(3).

175.    Pursuant to 47 U.S.C. § 227(b)(3)(A), Plaintiff seeks injunctive relief prohibiting

      such conduct in the future.


**COUNT III**

(Negligent Violation of the TCPA
"Sales Call/DNC" Prohibition, 47 U.S.C. § 227 et seq.)

176.    Plaintiff incorporates and realleges, as though fully set forth herein, each of the

      paragraphs above.

177.    As a result of Defendants' and Defendants' agents' negligent violations of 47 U.S.C.

      § 227(c)(3)(F), and 47 C.F.R. 64.1200(c)(2), Plaintiff seeks for himself $500 in statutory

      damages for each and every violation, pursuant to 47 U.S.C. § 227(c)(3)(F).

178.    Pursuant to 47 U.S.C. § 227(c)(5)(A), Plaintiff seeks injunctive relief prohibiting

      such conduct in the future.


**COUNT IV**

(Knowing and/or Willful Violation of the TCPA
"Sales Call/DNC" Prohibition, 47 U.S.C. § 227 et seq.)

179.    Plaintiff incorporates and realleges, as though fully set forth herein, each of the

      paragraphs above.

180.    As a result of Defendants' and Defendants' agents knowing and/or willful violations of 47

U.S.C. § 227(c)(3)(F), and 47 C.F.R. 64.1200(c)(2), Plaintiff seeks for himself treble

damages, as provided by statute, up to $1,500.00 for each and every violation, pursuant to

47U.S.C. § 227(c)(5).

181.    Pursuant to 47 U.S.C. § 227(c)(5)(A), Plaintiff seeks injunctive relief prohibiting

such conduct in the future.


## COUNT V

(Negligent Violation of the TCPA
"Opt-Out Mechanism" Requirement, 47 CFR 64.1200 (b)(3))

182.    Plaintiff incorporates and realleges, as though fully set forth herein, each of the

paragraphs above.

183.    As a result of Defendants' and Defendants' agents, negligent violations of 47 CFR

64.1200 (b)(3), Plaintiff seeks for himself $500 in statutory damages for each and every

violation, pursuant to the implied private right of action.


## COUNT VI

(Knowing and/or Willful Violation of the TCPA
"Opt-Out Mechanism" Requirement, 47 CFR 64.1200 (b)(3))

184.    Plaintiff incorporates and realleges, as though fully set forth herein, each of the

paragraphs above.

185.    As a result of Defendants' and Defendants' agents knowing and/or willful violations of 47

CFR 64.1200 (b)(3), Plaintiff seeks for himself treble damages, as implied, up to $1,500.00

for each and every violation, pursuant to the implied private right of action.

33

## COUNT VII

(Negligent Violation of the TCPA
"Do-Not-Call Policy" Requirement, 47 CFR 64.1200 et seq.)

186.   Plaintiff incorporates and realleges, as though fully set forth herein, each of the

paragraphs above.

187.   As a result of Defendants' and Defendants' agents, negligent violations of 47 CFR

64.1200(d)(l), Plaintiff seeks for himself $500 in statutory damages for each and every

violation, pursuant to the implied private right of action.

## COUNT VIII

(Knowing and/or Willful Violation of the TCPA
"Do-Not-Call Policy" Requirement, 47 CFR 64.1200 et seq.)

188.   Plaintiff incorporates and realleges, as though fully set forth herein, each of the

paragraphs above.

189.   As a result of Defendants' and Defendants' agents knowing and/or willful violations of 47

CFR 64.1200( d)(l) Plaintiff seeks for himself treble damages, as implied, up to $1,500.00 for

each and every violation, pursuant to the implied private right of action.

## COUNT IX

(Negligent Violation of the TCPA
"Do-Not-Call List" Requirement,47 CFR 64.1200 et seq.)

190.   Plaintiff incorporates and realleges, as though fully set forth herein, each of the

paragraphs above.

191.   As a result of Defendants' and Defendants' agents, negligent violations of 47 CFR

64.1200(d)(3), Plaintiff seeks for himself $500 in statutory damages for each and every

violation, pursuant to the implied private right of action.


## COUNT X

(Knowing and/or Willful Violation of the TCPA
"Do-Not-Call List" Requirement, 47 CFR 64.1200 et seq.)

192.   Plaintiff incorporates and realleges, as though fully set forth herein, each of the

paragraphs above.

193.   As a result of Defendants' and Defendants' agents knowing and/or willful violations of 47

CFR 64.1200(d)(3) Plaintiff seeks for himself treble damages, as implied, up to $1,500.00 for

each and every violation, pursuant to the implied private right of action.


## COUNT XI

(Negligent Violation Virginia Telephone Privacy
Protection Act **VTPPA**
Va. Code § 59.1-510 - § 59.1-518)

194.   Plaintiff incorporates and realleges, as though fully set forth herein, each of the

paragraphs above.

195.   Defendants, and each of them, are "Telephone Solicitor[s]", as that term is defined in Va.

Code § 59.1-510.

196.   Defendant(s) knew, or should have known, Plaintiff's wireless telephone line has been on

the National Do Not Call Registry since 2008.

197.   Despite this, Defendant(s) Doe and Defendant Estrada repeatedly made telephone

solicitation calls to Plaintiff in violation of **VTPPA** VA. CODE ANN. § 59.1-514 (A), (B).

198.   Defendant Doe and Defendant Estrada in violation of **VTPPA** VA. CODE ANN. § 59.1-
513   made some of the calls using spoof numbers as described in this complaint and which
will be further described in an amended complaint upon completion of discovery.

199.   Defendant Doe(s) did not, initially, identify themselves or the person or company on
whose behalf they were calling in violation of **VTPPA** VA. CODE ANN. § 59.1-512.

200.   Defendant Doe and defendant Estrada did not identify himself themselves initially in
violation of **VTPPA** VA. CODE ANN. § 59.1-512.

201.   CounselorChen, P.C., Global Client Solutions, John Estrada, Brian Brittain, and Candice
O'Brien's liability: The 2020 VTPPA Definitions, § 59.1-510 which when combined with §
59.1-514.1 deem the aforedescribed defendants to be seller(s) and thus liable for the calls.
Specifically, § 59.1-514.1 states:

> A. A seller on whose behalf or for whose benefit a telephone solicitor makes or
> initiates a telephone solicitation call in violation of any provision of § 59.1-511,
> 59.1-512, 59.1-513, or 59.1-514 and the telephone solicitor making or initiating
> the telephone call shall be jointly and severally liable for such violation.

> B. A telephone solicitation call offering or advertising a seller's property, goods,
> or services shall be presumed to have been made or initiated on behalf of or for
> the benefit of the seller, whether or not any agency relationship exists between the
> telephone solicitor and the seller, whether or not the seller supervised or directed
> the conduct of the telephone solicitor, and whether or not the telephone solicitor is
> shown to have acted at the seller's direction and request when making or initiating
> the telephone solicitation call. The presumption may be rebutted if it is shown by
> clear and convincing evidence that the seller did not retain or request the
> telephone solicitor to make telephone solicitation calls on the seller's behalf or for
> the seller's benefit and that the telephone solicitation calls offering or advertising
> the seller's property, goods, or services were made by the telephone solicitor
> without the seller's knowledge or consent. 2019, cc. 256, 264.

## COUNT XII

### (Willful Violation Virginia Consumer Protection Act
### VCPA
### Va. Code § 59.1-200(1))

202.    Plaintiff incorporates and realleges, as though fully set forth herein, each of the

paragraphs above.

203.    Both Andrew Chen of CounselorChen, P.C. and John Estrada of Consumer Solutions

Center violated the VCPA because they misrepresented to Claimant and his wife, Jacqueline

Beal, their services as those of another.  Section 59.1-200(1) of the VCPA specifically states

that it is unlawful for a "supplier in connection with a consumer transaction...(to)

(m)isrepresent (its) goods or services of another."

204.    As a result of Defendants' and Defendants' agents knowing and/or willful violations of

Va. Code § 59.1-200(1) Plaintiff seeks for himself treble damages of $1,000.00.


**WHEREFORE, Plaintiff prays for relief against defendants, and each of them, as follows:**

**Prayer for Relief**


On Counts 1-12:

A.  For awards of $500 for each negligent violation as set forth in Counts 1-11;

B.  For awards of $1,500 for each knowing/willful violation as set forth in Counts 1-11.

C.  For Count XII $1,000

D.  Injunctive relief against Defendants, and each of them, to prevent future wrongdoing.

Total statutory damages: To be determined at the conclusion of discovery.  To be determined

number of counts each of:  sales call to a number on the Do Not Call Registry, "robocall",

lack of opt-out mechanism, caller ID spoofing, failure to put Plaintiff's number on

Defendants' Do Not Call list, and failure to provide Plaintiff a copy of Defendants' Do Not

Call policy, with treble damages for each.)

For All Causes of Action:

E.  Punitive damages to punish Defendants for their willful, illegal, and deliberate

tortious conduct and to deter others who may otherwise engage in similar willful illegal and

deliberate tortious conduct;

Prejudgment interest at the maximum legal rate;

Reasonable attorney fees and costs incurred per **VTPPA** VA. CODE ANN. § 59.1-512.

F.  And for such other and further relief as the Court deems proper.


## **Demand for Jury Trial**


Plaintiff hereby demands a trial by jury on all claims so triable.


Dated: August 29, 2021

_____

Charles R. Clemens
Plaintiff Pro Se
22527 Welborne Manor SQ
Ashburn, VA  20148

Telephone:     (518) 495-9301
Fax: (703) 951-0444
Email: nychuck@hotmail.com

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRIGINIA**
*Alexandria* **DIVISION**

FILED

_Charles R. Clemens_
_____
Plaintiff(s),

2021 AUG 30 P 2: 09

v.

Civil Action Number: 1:21-CV-1002

_Counselor Chen P.C. et al_
_____
Defendant(s).

## LOCAL RULE 83.1(M) CERTIFICATION

I declare under penalty of perjury that:

No attorney has prepared, or assisted in the preparation of _Plaintiff's original Complaint_
                                                              **(Title of Document)**

_Charles R. Clemens_
_____
Name of *Pro Se* Party (Print or Type)

_Charles R. Clemens_
_____
Signature of *Pro Se* Party

Executed on: __8/29/2021__ (Date)

**OR**

The following attorney(s) prepared or assisted me in preparation of _____.
                                                                      **(Title of Document)**

_____
(Name of Attorney)

_____
(Address of Attorney)

_____
(Telephone Number of Attorney)
Prepared, or assisted in the preparation of, this document

_____
(Name of *Pro Se* Party (Print or Type)

_____
Signature of *Pro Se* Party

Executed on: _____ (Date)